**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 22-CR-190 (TNM) |
| | : | Case No. 23-CR-43 (TNM)-6 |
| | : | |
| JEXON MADRID-FLORES, | : | |
| a.k.a. "Spooky" | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM IN AID OF SENTENCING

Jexon Madrid-Flores is an unrepentant gang member directly responsible for a drive-by shooting in broad daylight that could have killed its intended target as well as a kidnapping that resulted in the victim's cold-blooded murder, both of which were done out of nothing more than the defendant's devotion to the transnational street gang 18th Street.  Far from expressing remorse for these heinous crimes or accepting responsibility, the defendant believes the lies he apparently continues to tell himself, denying to the Probation Officer that he had been a member of any gang, *see* PSR at ¶ 85, despite having 18th Street literally tattooed on his chest, *see* Gov. Tr. Ex. 238a. The defendant went one step further, writing the Court while pending sentencing a 12-page plea professing actual innocence, highlighting his work history and education, and claiming repeatedly that he was convicted without evidence. *See* Gov. Sent. Ex. 1.  Very much consistent with his defense at trial, the defendant calls the evidence against him "theories" and "brainstorms," because "let's face it, they don't have the facts, concrete tangible evidence, or the witnesses," *id.* at 3, and he chalks the charges against him up to associating with "people I did not know and people who were *maybe* up to no good."  *Id.* at 7.  (emphasis added).  This is an individual who – despite receiving a fair trial and benefitting from outstanding advocacy of experienced defense counsel – believes himself to have been railroaded.  The defendant ended his screed by saying how his trial

1

makes him question our justice system, how he can be held responsible for the actions of others while the government's cooperators go free, conveniently ignoring the fact that while he continued to conspire with his co-defendants who committed horrible crimes in furtherance of their shared goals, the government's cooperators admitted to their misdeeds and renounced their participation in the gang in perhaps the most public way possible.

Fortunately, the jury brought an end to the defendant's efforts to evade accountability for his crimes, convicting him of almost every charge.  The government now asks this Court to disregard the defendant's lies and self-serving statements and hold him accountable for the horrific offenses he committed.  Faced with an extraordinarily dangerous defendant who lives in an alternate reality, lies to himself about being improperly convicted, and refuses to come to terms with his own wrongdoing, the Court must impose a severe sentence.  For the reasons herein, the United States requests that the Court sentence the defendant to the statutory maximum for nearly every count of conviction in 22-cr-190 and 23-cr-143, including a sentence of life imprisonment on Count 3 of the latter.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

On May 26, 2022, a federal grand jury empaneled in the District of Columbia returned an seven-count indictment against the defendant for the May 2021 drive-by shooting of Cristian Hernandez, charging him with Violent Crime in Aid of Racketeering – Assault With Dangerous Weapon, in violation of 18 USC §§ 1959(a)(3) and 2 (Count 1); Using, Carrying, Possessing, and Brandishing a Firearm During and in Relation to a Crime of Violence, in violation of 18 USC §§ 924(c)(1)(A)(ii) and 2 (Count 2); Violent Crime in Aid of Racketeering - Attempted Murder, in violation of 18 USC §§ 1959(a)(5) and 2 (Count 3); Using, Carrying, Possessing, Brandishing, and Discharging a Firearm During and in Relation to a Crime of Violence, in violation of 18 USC §§ 924(c)(1)(A)(iii) and 2 (Count 4); Assault With Intent to Kill While Armed, in violation of 22

DCC §§ 401 and 4502 (Count 5); Aggravated Assault While Armed, in violation of 22 DCC §§ 401.01 and 4502 (Count 6) and Carrying a Pistol Without a License (Outside a Home or Place of Business, in violation of 22 DCC § 4504(a).[1]   This case was subsequently styled as 22-cr-190 TNM).

On February 9, 2023, a federal grand jury empaneled in the District of Columbia returned an eleven-count Indictment against twelve members of 18th Street, including the defendant, charging them with participating in a years' long racketeering conspiracy involving two separate cliques[2] operating in and around the D.C.-metro area.   With respect to the defendant, the grand jury charged him with the overall racketeering conspiracy in Count 1, that is, Conspiring to Participate in a Racketeer Influenced and Corrupt Organization ("RICO Conspiracy"), in violation of 18 U.S.C. § 1962(d)[3].   Among the overt acts enumerated as part of Count 1 was the defendant's participation in the drive-by shooting that was at the heart of 22-cr-190.   Beyond the defendant's drive-by shooting, the Indictment centered on two separate murders – one of Victim # 6, Carlos Ramos Martinez, a.k.a., "Fire" and the other of Victim # 8, Danis Alcides Salgado Mata, a.k.a., "Caballo," – perpetrated by the gang in furtherance of the conspiracy's objectives.   The Defendant was charged in Count 3 for Conspiracy to Commit Kidnapping resulting in death, in violation of 18 U.S.C. § 1201(c), in connection with his role in the conspiracy to kidnap Martinez, which ended in Martinez-s death.[4]

---

[1] The government orally moved to dismiss that last count prior to the close of its case-in-chief, which this Court granted.

[2] As specified in the Indictment, members of 18th Street are organized into "cliques," or smaller groups operating within specific cities or regions that all operate under the umbrella rules of 18th Street.  Additionally, there are two larger factions of 18th Street consisting of multiple smaller cliques: The Surenos and the Revolucionarios.

[3] The defendant was not included in the Special Sentencing Factors as to Count 1.

[4] The defendant was also charged with the same offenses in the Superseding Indictment for 23-cr-43 (TNM) returned on February 13, 2024.

The defendant proceeded to trial in April 2024 in both 22-cr-190 (TNM) and 23-cr-43 (TNM), which ended with the jury rendering its verdict the following month, finding him guilty of nearly all offenses with which he was charged.  At trial, the government established that the defendant was a *civil* and then a homeboy within the TLS clique operating in and around Northwest Washington, D.C.  *See* 4/22/2024 Trial Transcript AM Session, Testimony of Felix Quintanilla-Gomez, at 85.  The defendant was, by all accounts, a devoted member of the gang, frequently posting of his allegiance on his Snapchat account, including with other members of the gang.  *See, e.g.,* Govt. Tr. Ex. 253a; 249a; 238a.






Furthermore, despite his protestations to the contrary in his letter, Sent. Ex. 1 at 7, the defendant

is captured in at least one photograph with numerous 18th Street members from D.C., Maryland,

and Virginia.  *See* Gov. Tr. Ex. 259a.[5]

---

[5] This picture was identified by law enforcement on numerous social media warrant returns for known 18th Street members.  The defendant had this picture on his Snapchat with the words "La DC8" on a banner below; the picture excerpted above is from another gang member's social media account.



In May 2021, the defendant was a *civil* in TLS and, as the evidence at trial established, looking to advance his rank to become a Homeboy. Trial Transcript 4/18/2024 PM, Testimony of Ronald Montoya-Pocasangre, at 101:8-13. The way to become a Homeboy was very simple for the defendant – killing someone. *See id.* at 101:16-17. On May 21, 2021 – the defendant set out to do just that. That afternoon, Christian Hernandez and his friend Ever Escobar were biking up 14th Street and stopped at a convenience store along the way. While at the store, Mr. Hernandez interacted with Emerson Aguirre-Morales, a.k.a., "Mota," a homeboy within the TLs clique, during which the two exchanged words, culminating in Mota pulling a weapon. *See generally*, Trial Transcript 4/17/2024 PM, Testimony of Ever Escobar, at 97-98; Trial Transcript 4/18/2024 AM, Testimony of Christian Hernandez, at 30; Gov. Tr. Exs. H1 and H2. At the time, both Mr. Hernandez and Mr. Escobar noticed that there was another individual in the driver's seat of a

nearby black car, who also flashed a weapon without exiting the car.  *See* Trial Transcript 4/17/2024 PM, Testimony of Ever Escobar, at 98:14-18; Trial Transcript 4/18/2024 AM, Testimony of Christian Hernandez, at 32:4-8.  Mr. Escobar (correctly) recognized the individual inside the store as a former student at Roosevelt High School who was affiliated with the 18th Street gang.  *See* Trial Transcript 4/17/2024 PM, Testimony of Ever Escobar, at 100:11-14.  Mr. Hernandez and Mr. Escobar immediately ran back inside of the store upon seeing the weapons, with the former taking a photograph and also placing a call to 9-1-1.  *See* Trial Transcript 4/18/2024 AM, Testimony of Christian Hernandez, at 33-34.  Eventually, they left the store after a few minutes, lulled into a false sense of security given that they did not see the black car.  *See id.* at 35; *see* Trial Transcript 4/17/2024 PM, Testimony of Ever Escobar, at 103:1-11.

The two then began biking northbound on 14th Street NW, toward Mr. Escobar's aunt's house, before becoming separated as Mr. Hernandez attempted to respond to incoming calls while biking.  *See* Trial Transcript 4/18/2024 AM, Testimony of Christian Hernandez, at 36:13-14; Trial Transcript 4/17/2024 PM, Testimony of Ever Escobar, at 104:4-11.  Ultimately, as he was riding up 14th Street, Mr. Hernandez heard an explosion, saw the same car and individuals that he had observed earlier at the convenience store, and felt he had been hit.  *See* Trial Transcript 4/18/2024 AM, Testimony of Christian Hernandez, at 37-40.  Mr. Hernandez ended up hiding under cars after he sustained gunshot wounds, as the defendant's car sped off with the defendant and Mota inside it.  As Mr. Hernandez testified, he immediately went to the hospital and received treatment and went to therapy for years after the shooting.  *See id.* at 43.

For their part, the defendant and Mota had thought that they had a successful kill of a member of MS-13 that would result in the former's ascension within the gang.  Mota was the first to begin politicking for the defendant.  Mota contacted Ronald Montoya-Pocasangre, a.k.a.

"Killer," a former *Revolucionario* who had been affiliated with TLS at the time and was well regarded within its ranks, to tell him of the good work that the defendant had done.  Unbeknownst to Mota (and everyone else), Montoya had begun cooperating with the Federal Bureau of Investigation and was regularly providing intelligence to his handler at the Bureau.  Mota first met with Montoya alone, telling him that he and the defendant had attacked and potentially killed a potential rival before describing the drive-by in detail.  *See* 4/18/2024 Trial Transcript PM Session, Testimony of Ronald Montoya-Pocasangre, at 103-04.  The defendant and Mota then met with Montoya together shortly thereafter for the purpose of positioning the defendant for promotion within the gang.  *Id.* at 106:18-25.  It was at that point that the defendant admitted to his participation in the shooting.  *Id.* at 107:4-9.

Beyond the testimony of the government's cooperator, there was ample other evidence pointing squarely to the defendant as the driver in the drive-by shooting, including historical cell-site location information putting the defendant's phone at the convenience store at the time in question; surveillance footage from a WMATA bus capturing the car driving northbound on 14th Street; a license plate reader hit for the defendant's car by the scene of the shooting two minutes after it occurred; and then mounds of physical evidence from the car pointing toward the defendant and Mota occupying it on the day in question.

Yet the defendant was far from finished with committing crimes on behalf of the gang.  In July 2021, as the evidence at trial bore out, he was involved in the decision to have Fire kidnapped from Washington, D.C., a kidnapping that ultimately led to Fire's murder.  As the Court knows, Fire, a *Revolcuionario*, had fled the Richmond-area in early July 2021 due to an outstanding warrant for his arrest and had come to the D.C.-area to stay with a *civil* in LCB, Luis Argueta Gomez, a.k.a., "Seco."  *See* Trial Transcript 4/25/2024 AM, Testimony of Luis Argueta Gomez,

at 40-41.  Upon linking up with Argueta-Gomez, and hearing of his misgivings with the leadership of LCB, Fire encouraged Argueta-Gomez to change cliques from the Maryland-based LCB to Tiny Locos Sureños, based out of D.C.  *Id.* at 44.  The defendant was present at an initial meeting at the Motel 6 on Georgia Ave. NW with Fire and telephoned a TLS homeboy, Felix Quintanilla-Gomez, to let him know of the potential switch in cliques.  *See* Trial Transcript 4/22/2024 PM, Testimony of Felix Quintanilla-Gomez, at 4-5.

A meeting was held in Bladensburg, Maryland between members of the cliques on July 12, 2021, including the defendant, in which Argueta-Gomez, at Fire's urging, expressed his desire to switch and voiced his complaints with LCB leadership, to include Carlos Rolando Martinez-Mora, a.k.a., "Crosty," and Bradley Andree Martinez-Mora, a.k.a., "Joker."  *Id.* at 47-48; Trial Transcript 4/22/2024 PM, Testimony of Felix Quintanilla-Gomez, at 8-9.  LCB leadership – Crosty specifically – reminded Argueta-Gomez that the only way out of LCB was with a bullet to the head.  Trial Transcript 4/25/2024 AM, Testimony of Luis Argueta-Gomez, at 48:14-17.  Fire's presence and commentary at this meeting only caused further friction between him, a member of a rival sect, and LCB, because he had previously recruited prior LCB members away from the clique.  *Id.* at 49:21-24.

Matters came to a head the following evening, when various TLS and LCB homeboys descended upon Quintanilla-Gomez's apartment in Washington, D.C. where Fire and Argueta-Gomez were attending a party for the sister of Quintanilla-Gomez's sister.  *Id.* at 56.  Outside were multiple homeboys who were on the phone with a senior gang member from El Salvador and were questioning Fire.  Among those present was the defendant himself.  *Id.* at 57:1.  Ultimately, the individuals present, including the defendant, voted to forcibly remove Fire from the D.C.-area and ordered him to be taken in Argueta-Gomez's car to New York.  Trial Transcript 4/22/2024 PM,

Testimony of Felix Quintanilla-Gomez, at 25-27.  The defendant willingly participated in this vote. *See id.*  Argueta-Gomez, Quintanilla-Gomez, Fire, and an LCB homeboy, Jose Alvarado-Velasquez, a.k.a., "Vago," ultimately drove Fire up Interstate 95 in the direction of New York, with the latter being armed.  *Id.* at 37.

At some point, Argueta-Gomez pulled the car over near the Delaware / Maryland border after Vago indicated he had to go to the bathroom.  At that point, Vago ordered everyone out of the car and, in response to Fire's question about whether he was about to be murdered, Vago answered "You already know what the rules are, what we be doing – what we known for."  *Id.* 41:6-7.  At that point, a white construction van pulled up alongside Argueta-Gomez's car, and the defendant, who had been driving, another civil named Cali, and co-defendant Gerlin Diaz-Lopez, a.k.a., "Sicario," got out of the vehicle.  *Id.* at 41.  Sicario was armed with a firearm already, while the defendant supplied Argueta-Gomez with another firearm, bringing the total of armed individuals detaining Fire to three.  *Id.* at 43:5-6.  From there, the defendant got back into the car and drove off to meet at the next rendezvous point, while Sicario, Vago, Argueta-Gomez, and Quintanilla-Gomez marched Fire through the wooded area to the side of the interstate, where they ultimately took turns firing round after round of ammunition into him, leaving his body by the side of the road to rot for days.

The four next got into Argueta-Gomez's car and drove into Delaware, where they were followed by the van.  *See* Trial Transcript 4/25/2024 PM, Testimony of Luis Argueta Gomez, at 10-11.  At that point, Vago ordered Argueta-Gomez and the others to gather their belongings and get out of the car, after which the license plate was removed from the car and Vago and Sicario doused it with gasoline and lit it on fire.  *See id*. at 11-12.  The gang members then got in the van and escaped.  *See id.* at 13.

***

On May 10, 2024, the jury returned its verdict for both 22-cr-190 and 23-cr-43.  In 22-cr-190, the jury convicted the defendant of Counts 1 through 4, including the special findings for Counts 2 and 4, and then convicted the defendant of Count 6 as well.  In 23-cr-43, the jury convicted the defendant of Count 1, finding that he participated in all categories of racketeering activities listed on the verdict sheet, as well as Count 3.

## II.   DISCUSSION AND APPLICATION OF U.S. SENTENCING GUIDELINES AND 3553(a) FACTORS

A.   Generally Applicable Legal Principles

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).  See *United States v. Gall*, 128 S. Ct. 586, 596 (2007).  The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –

(i) issued by the Sentencing Commission ...; and

(ii) that, . . . are in effect on the date the defendant is sentenced; ...

(5) any pertinent policy statement –

(A) issued by the Sentencing Commission ... and

(B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

B.     Guidelines Calculations

Turning to 3553(a)(4)(A), the government largely concurs with the assessment of the United States Probation Office for the District of Columbia (hereinafter, "U.S. Probation") in its Pre-Sentence Investigation Report ("PSR") regarding the total offense level applicable in this case, the defendant's criminal history score and the resulting range under the U.S. Sentencing Guidelines (hereinafter, "Guidelines" or "USSG").

1.     *Offense Level Calculation*

First, the government agrees with U.S. Probation's grouping of the various counts of conviction. Counts 1 and 3 of 22-cr-190 should group together because they involve the same victim and the acts are connected by a common criminal objective. *See* PSR at ¶ 88. Moreover, Counts 1 and 3 of 23-cr-43 should also group together, because one of the overt acts in Count 1 is the basis for Count 3, and thus they involve the same victim and there are two or more acts connected by a common criminal objective and constitute a common scheme or plan. *See id.* at ¶

89.  Yet these various counts would not group together because these four federal offenses of conviction represent separate and distinct harms.  *Id.* at ¶ 90.

For the first group – 22-cr-190 – the government agrees that the applicable Guideline for both counts in the group is §2E1.3, which provides that the base offense level is the greater of 12 or the applicable level for the underlying racketeering activity.  Here, the count which produces the higher offense level – by virtue of having the more serious underlying racketeering activity – is Count 3, VICAR–Attempted Murder.  That provides a Base Offense Level of 33 pursuant to §2A2.1(a)(1), with an additional two-level enhancement because the victim sustained serious bodily injury, under §2A2.1(b)(1)(B).  This leads to an Adjusted Offense Level of 35 for the first group.

For the second group, both counts of conviction lead to a Base Offense Level is § 2A1.1(a).  Because the underlying racketeering activity in which the defendant participated was the conspiracy to kidnap Fire (i.e., Count 3), §2X1.1 of the Guidelines applies, which notes that the Guideline for the underlying offense should apply.  Here, because the kidnapping was actually carried out successfully, that Guideline provision is §2A4.1.

In evaluating §2A4.1, the base offense level is 32 and the analysis shifts to any specific offense characteristics or cross-references that should apply in the defendant's case.  It is at this juncture that the Court should attribute the death of Fire to the defendant under 2A4.1(c) based on the relevant conduct of his co-conspirators.  *United States v. Saavedra*, 148 F.3d 1311, 1317 (11th Cir. 1998) ("Once the proper guideline section has been selected, relevant conduct is considered in determining various sentencing considerations within that guideline, including the base offense level, specific offense characteristics, and any cross-references."); *see also United States v. Belfast*, 611 F.3d 783, 826 (11th Cir. 2010) (applying § 2A4.1(c) on the basis of relevant conduct).  For

the defendant to be held accountable for the relevant conduct of other co-conspirators, the subsequent offenses committed by his co-conspirators must be (i) within the scope of the jointly undertaken criminal activity; (ii) in furtherance of that activity; and (iii) reasonably foreseeable in connection with that activity.

Here, the defendant can and should be held accountable at sentencing for what happened to Fire after he took part in the vote. The murder of Fire is clearly in furtherance of the conspiracy defendant joined – after all Fire was murdered to prevent further interference from a *Revolucionario* in the business of the local cliques. Fire's murder was also within the scope of jointly undertaken criminal activity the defendant was involved in and reasonably foreseeable to the defendant in connection with that activity. The defendant was no stranger to the idea that part of the gang's *modus opernadi* was to commit murders and eliminate external and internal threats. First, the jury explicitly found beyond a reasonable doubt that the defendant agreed to join the conspiracy knowing and agreeing that members would be committing murders on behalf of the gang in rendering its verdict for the defendant on Count 1. Indeed, just weeks prior to his vote to remove Fire, the defendant himself had attempted to commit one such murder. Furthermore, and more specifically, the defendant had attended the meeting the day prior to the vote in which LCB leaders had become visibly agitated at Fire and Argueta-Gomez when the latter made clear they wanted to switch, with Crosty ending that conversation by saying that the only way out of the gang was with a bullet to the head, signaling that there would be grave consequences for this attempted switch. While there is some evidence in the record that, the following night, after the vote, some of the homeboys were worried about individuals like the defendant helping Fire and indicated that they were merely taking Fire on a "ride" up to New York to a friend's place, this was perhaps the most thinly-veiled ruse imaginable. Not even Fire himself believed it when he said right after the

vote in front of the entire group – defendant included – "if you are going to kill me, just shoot me in the head." *See* 4/24/24 Trial Transcript AM, Testimony of Felix Quintanilla-Gomez, at 12:20-25.  Fire knew his ultimate fate after the homeboys took the vote to remove him – and so too did the defendant.

Given the above, the cross-reference of §2A4.1(c) applies, which notes that "[if] the victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply §2A1.1."  Here, because the murder took place during a kidnapping, regardless of whether it was First- or Second-Degree Murder, it would still fall under 18 U.S.C. § 1111 and, as such, § 2A1.1 would apply.  *See Belfast*, 611 F.3d at 826 ("In other words, 18 U.S.C. § 1111(a) is applicable wherever a victim for whom the defendant is being sentenced under U.S.S.G. § 2A4.1 is also murdered.")  That results in a Base Offense Level of 43.  The United States does believe that there should also be a two-level adjustment because of the involvement of multiple minors throughout the general racketeering conspiracy and in the conspiracy to kidnap Fire, under §3B1.4.  That leads to an Adjusted Offense Level for the second group of 45.

Given that the adjusted offense level of the second group would be 10 levels greater than first, there would be no multiple count adjustment under §3D1.4(a), (b) and (c).  As such, the Offense Level of 45 would control and would yield a Total Offense Level of 43, pursuant to USSG 5 A – Sentencing Table, comment (n.2).

This analysis addresses all counts of conviction except for Counts 2 and 4 of 22-cr-190 – the convictions under 18 U.S.C. § 924(c) – which do not group under any circumstances.  Under §2K2.4(b), if the defendant was convicted of violating Section 924(c) of Title 18, the guideline

sentence is the minimum term of imprisonment required by statute, which in this case, is 84 months

and 120 months' incarceration respectively.

### 2. *Criminal History*

The government agrees that the defendant's total criminal history score is zero and that he

should be in criminal history category I.  The government concurs, however, that the defendant is

not entitled to a "Zero Point Offender" adjustment under §4C1.1(a)(4).

### 3. *USSG Range*

Under the Guidelines, at a Total Offense Level of 43, in Criminal History Category I, the

defendant's range is 360 months' incarceration to life imprisonment, with the convictions under

924(c) to run consecutively to this sentence and to each other.[6]

### C.   Sentencing Recommendation

The government recommends the following sentences for the defendant:

| Count of Conviction (Case) | Recommended Sentence | Applicable Mandatory Minimum / Statutory Maximum | Consecutive / Concurrent |
|---|---|---|---|
| 1 (22-cr-190) | 120 months | N/A / 120 months | Concurrently[7] with all other counts, except Counts 2 and 4 of 22-cr-190 |

---

[6] While in *United States v. Anderson*, 59 F.3d 1323 (D.C. Cir. 1995), the D.C. Circuit found that multiple convictions for using or carrying firearm 'during and in relation to' a drug trafficking crime may not be linked to single underlying predicate offense, here we have two distinct 924(c) convictions tied to two distinct crimes – first, the VICAR – Assault Dangerous Weapon that occurred at the convenience store, and second the VICAR-Attempted Murder, which occurred ten minutes thereafter in a different location.  Furthermore, while the Circuit expounded upon *Anderson* in *United States v. Wilson*, 160 F.3d 732, 749 (D.C. Cir. 1998) and held that 924(c) convictions could not run consecutive to one another when the same firearm was used in two different predicate offenses, *Wilson* expressly contemplated that there would be situations in which there could be multiple 924(c) convictions for multiple uses of the same firearm.  More specifically, the *Wilson* court found that "there may be circumstances in which such offenses could support more than one § 924(c) charge—as where, for example, the evidence shows distinct uses of the firearm, first to intimidate and then to kill…" *Id.*  Here, that is precisely the scenario – defendant's first use of the firearm was to intimidate both Mr. Hernandez and Mr. Escobar while they were outside the convenience store.  The second use was his aiding and abetting Mota in discharging the firearm 10 minutes later.

[7] The government would note at the outset that because 22-cr-190 and 23-cr-43 involve separate and distinct victims, that could merit the sentences in connection with them to be served consecutively.  However, given that the government is recommending a term of life imprisonment for Count 3 of 23-cr-43, the government would recommend that everything but the 924(c) convictions  run concurrently pursuant to §5G1.3, which provides that "[i]f the sentence

| 2 (22-cr-190) | 84 months | 84 months / life imprisonment | Consecutive to all other counts |
| 3 (22-cr-190) | 120 months' | N/A / 120 months | Concurrently with all other counts, except Counts 2 and 4 of 22-cr-190 |
| 4 (22-cr-190) | 120 months' | 120 months / life imprisonment | Consecutive to all other counts |
| 6 (22-cr-190) | 360 months' imprisonment | 60 months / 360 months | Concurrently with all other counts, except Counts 2 and 4 of 22-cr-190 |
| | | | |
| 1 (23-cr-43) | 240 months' imprisonment | N/A / 240 months | Concurrently with all other counts, except Counts 2 and 4 of 22-cr-190 |
| 3 (23-cr-43) | Life imprisonment | N/ A / life imprisonment | Concurrently with all other counts, except Counts 2 and 4 of 22-cr-190 |

The government believes that such a sentence will best effectuate the purposes of sentencing as set forth in 3553(a)(2)(A)-(D), that is, for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; afford adequate deterrence of criminal conduct; protect the public from further crimes of the defendant; and allow the defendant with training, treatment, and other type of care he may require.

 1. *Nature and Seriousness of the Offense*

The defendant's actions resulted in the death of a human being and the near death of another. The defendant did this because he is a member of a violent transnational criminal enterprise which demands that members like him kill others as part of their membership in the group. The events of May 21, 2021, and July 13, 2021, were not an aberration in an otherwise upstanding life, nor were they accidental; they were the logical culmination of the defendant's decision to join 18th Street. First, the defendant purposely attempted to kill Christian Hernandez

---

imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law."

as a means of professional advancement – advancement within the ranks of the gang.  Second, he agreed and voted in favor of Fire's forcible removal from the District, which resulted in Fire's murder hours after the vote, something which was reasonably foreseeable to the defendant based on his knowledge of the gang's operations, its code, and his prior participation in an attempted murder just weeks earlier against another perceived threat to the gang.  These offenses are not only severe in their own right, but are all the more heinous because they were committed as a condition of membership in a sprawling criminal conspiracy which routinely demanded that its members go out and commit horribly violent crimes and create new victims.

Far from withdrawing from this conspiracy or renouncing its tenets, the defendant is so loyal to this enterprise and its ideals that he literally has its name permanently branded on his skin. *See* Gov. Tr. Ex. 238a (defendant's Snapchat video showing the "XVIII" tattoo on the right side of his chest).  He has expressed no remorse, accepted no responsibility, and remained unapologetic about his conduct.  Indeed, in the absence of any reckoning or contrition, the defendant continues to lie, both to himself and to U.S. Probation and this Court, about his membership in 18th Street and the nature of the evidence against him.  In the face of the jury's finding of proof beyond a reasonable doubt – notwithstanding the zealous advocacy of his counsel – he protests his innocence and decries the fairness of the system.  In sum, the Court will be sentencing someone who is an unrepentant member of 18th Street whose primary source of ire appears to be that he could not simply continue to commit crimes on behalf of the gang without being arrested, charged, convicted, and incarcerated.

2.    *History and Characteristics*

The defendant's limited criminal history is of little relevance given his young age prior to his incarceration in the instant case (age 19) and corresponding lack of opportunity to accumulate

adult criminal convictions.  Indeed, his one prior arrest at the age of 18 in Prince George's County (Maryland) is telling for multiple different reasons.  In that matter, following a traffic stop of him and another 18th Street member, a Prince George's County detective noticed a bulge in the defendant's waistband, felt a hard object while conducting a protective pat down, and asked the defendant if this was a firearm, to which he replied "yes."  Detectives then recovered a silver .22 caliber Jennings Firearms handgun, loaded with three live rounds in the magazine.  Officers also later recovered nine grams of marijuana.  The defendant was charged with multiple firearms offenses arising from this incident, but the case never proceeded to trial because he was arrested, charged, and detained in connection with the instant matter approximately one year later.  In other words, simply by committing new and more heinous crimes with gang members which resulted in his pre-trial detention, he was able to avoid accumulating any criminal history points for a prior arrest in which a gun was pulled from his waistband while in the car with another gang member.

The defendant's history and characteristics offer little by way of explanation as to why he would have embraced the life of 18th Street.  Unlike many of his co-defendants, who grew up in gang-controlled neighborhoods in El Salvador and Guatemala and have repeatedly spoke of having to join a gang at a young age to survive, the defendant was born and raised in Washington, D.C.  The defendant and his siblings were raised in a two-parent household where both his mother and father worked to provide for their children.  *See* PSR at ¶ 81.  Their home was devoid of abuse and neglect.  *Id.*  The defendant went to school and continued his education post-high school by enrolling in the University of the District of Columbia, while also working steadily.  *See* PSR at ¶¶ 99-108.  In short, there was nothing compelling him to join 18th Street and immerse himself in the gang – quite the opposite, he had every opportunity to become a productive member of society – but nevertheless, he deliberately chose to join the gang and pledge his allegiance to it.

3.      *Need for the Sentence Imposed*

The government believes that the statutorily authorized, Guideline-compliant life sentence for Count 3 of 23-cr-43 will best effectuate the purposes of sentencing as set forth in 3553(a)(2)(A)-(D), that is, for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; afford adequate deterrence of criminal conduct; protect the public from further crimes of the defendant; and allow the defendant with training, treatment, and other type of care he may require.  The voluntary imposition of a life-sentence on an individual who is currently 22 years' old is an extraordinary punishment and not something the government recommends lightly – but the crimes at issue here are extraordinary as is the continuous threat posed by the defendant and his criminal organization. The defendant willingly joined an enterprise which preaches and practices death and destruction – particularly in the Hispanic community.  18th Street is not a criminal enterprise for which violence is a means to and end (like a drug trafficking organization) or a byproduct – the terror it sows in the community is precisely the point.  As part of his membership in this organization, he willingly participated in two violent crimes which left one man dead and another nearly dead and forever traumatized.  A sentence of life imprisonment will communicate clearly and fully the censure the defendant's conduct warrants and ensure that respect for the law is promoted with defendant's offenses being adequately punished.  Such a sentence will also serve the purposes of protecting the community and deterrence.  The defendant will remain a danger to the community, and the government's sentencing recommendation seeks to ensure that the defendant will not be able to commit another crime against the general public outside of prison.  It will also deter other similarly situated young men and women from joining criminal enterprises like 18th Street, or their archrival *Mara Salvatrucha–13*, by showing them that joining criminal organizations like them and carrying out their violent missions will only lead to longer and longer periods of incarceration.

**III.     CONCLUSION**

WHEREFORE, for the foregoing reasons, the United States asks that it impose the

sentences on the counts of conviction for 22-cr-190 and 23-cr-43 as outlined above.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     /s/ *Will Hart*_____
WILL HART
JOHN F. KORBA
SITARA WITANACHCHI
Assistant United States Attorneys
U.S. Attorney's Office for the
District   of Columbia
D.C. Bar No. 1029325 (Hart)
D.C. Bar No. 1010303 (Korba)
D.C. Bar No. 1023007 (Witanachchi)
601 D. St., N.W.,
Washington, D.C. 20530